## Reading City *v.* Miller, Appellant.

*Municipalities—License fee—Milk inspection—Cities of the second class.*

1. A city of the second class has the power to enact an ordinance entitled, "An Ordinance to secure the wholesomeness and purity of milk, meat and meat products, by authorizing the inspection thereof, by providing for the licensing of persons dealing therein, by prohibiting the sale or offering for sale of milk, meat and meat food products which are impure, unwholesome or adulterated, or otherwise unfit for human consumption, by providing penalties for the enforcement of the same," and directing the appointment of a "milk and meat inspector," providing for the licensing of vendors upon payment of $10.00 per year, and imposing penalties for violation of the ordinance ranging from $10.00 to $25.00 for first offenses, and from $50.00 to $100 for repeated offenses.

2. Such an ordinance does not violate the provision of the Act of May 23, 1889, P. L. 277, which forbids an ordinance to be passed "containing more than one subject, which shall be clearly expressed in its title."

Argued Nov. 17, 1910.  Appeal, No. 215, Oct. T., 1910, by defendant, from judgment of C. P. Berks Co., March Term, 1910, No. 4, for plaintiff on certiorari to a justice of the peace in case of City of Reading v. Irvin Miller.  Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.  Affirmed.

Certiorari to a judgment of a justice of the peace for $25.00 against defendant.

ENDLICH, P. J., filed the following opinion:

An ordinance of the city of Reading approved February 4, 1909, and entitled "An Ordinance to secure the wholesomeness and purity of milk, meat and meat products, by authorizing the inspection thereof, by providing for the licensing of persons dealing therein, by prohibiting the sale or offering for sale of milk, meat and meat food products which are impure, unwholesome or adulterated, or otherwise unfit for human consumption, by providing penalties for the enforcement of the same," directs the appointment and qualification of a "Milk and Meat Inspector,"—defines his duties, including the visitation of places in the city and within twenty miles of its limits of persons licensed to sell milk or meat therein, its analysis, etc.,—provides for the annual licensing of such vendors after due inspection of their premises and upon payment to the city of $10.00 and presentation of the receipt therefor to the inspector,—prohibits the sale of milk or meat within the city by persons not so licensed, whether from a wagon or from a store or stand,—and imposes penalties for violation of its mandates or prohibitions ranging from not less than $10.00 not more than $25.00 for first, to not less than $50.00 nor more than $100 for repeated offenses. A milk and meat inspector was duly appointed and qualified in accordance with the ordinance.  Without applying to him for or securing the license provided for, or paying the prescribed fee, the defendant engaged in the business of selling milk at a store in the city of Reading.  In a suit

brought against him in pursuance of the ordinance before an alderman, he was duly found to have violated the same, and judgment was entered against him for a penalty of $25.00 and costs. Thereupon he took out this writ of certiorari. The exceptions filed to the record returned by the alderman are (1) that the ordinance of February 4, 1909, is void as containing more than one subject; (2) that the city has no authority to enforce its provisions in relation to milk; (3) that the inspector appointed under it has no legal authority thereunder in relation to its milk provisions; (4) that the ordinance in this respect is an invasion of the powers of the board of health of the city as constituted by the Act of April 22, 1873, P. L. 831; (5) and (6) that it does not appear that defendant's premises had been inspected before institution of the suit, and that therefore the same was premature.

The last-mentioned exceptions may be disposed of with the remark that there is nothing in the ordinance which calls for an inspection as a condition precedent to the duty to apply for or obtain a license to sell milk, or to the maintenance of proceedings for selling without such: a circumstance apparently recognized by defendant's counsel in not adverting to these grounds of objection in either his oral argument or his brief in support of the certiorari.

1. The objection of multiplicity of subjects cannot be sustained. Of course it might have been practicable, though obviously inconvenient, to deal with the matter of inspection and sale of milk separately from that of the inspection, etc., of meat, by separate ordinances. Yet upon any save the narrowest view both are but divisions of the same subject,—the inspection, etc., of animal food products. Their treatment together, as parts of a single subject-matter, in an ordinance creating an office intended to deal with both for the same purpose and by substantially the same methods and with the same result, is indicated by common sense and expediency, and is even technically unexceptionable. So to hold is not to go as far as the decision in Com. v. Rothermel, 27 Pa. Supe-

rior Ct. 648, goes in declaring a statute whose subject was "game" and "game fish" not obnoxious to the constitutional prohibition against the inclusion of more than one subject. It is suggested that the statutes of the commonwealth dealing with the adulteration, etc., of milk have confined themselves strictly to that; and that the Act of May 25, 1907, P. L. 234, relating to the inspection, etc., of meat deals with meat and meat products and nothing else. But whilst a legislative treatment of the two jointly, as subdivisions of the same subject, would be entitled to considerable weight in requiring them to be so regarded, the circumstance that, for certain purposes coextensive with the entire state, each division was deemed of sufficient importance and magnitude to be dealt with separately can be of no controlling significance as affecting their treatment jointly in local municipal legislation.

2. The fact that the legislature has granted to cities the power of providing for the inspection of milk sold within its limits cannot be disputed. It is expressly conferred upon cities and boroughs generally by the Act of April 20, 1869, P. L. 81, and is clearly comprehended in the general power given to cities of the class to which Reading belongs by the Act of May 23, 1889, P. L. 277, art. V, sec. 3, cl. XXVI, "to make regulations to secure the general health of the inhabitants and to remove and prevent nuisances,"—an important branch of the police power as ordinarily understood. The argument, however, is that the matter of the sale of milk has been covered by certain statutes applicable to the entire state or to cities of the third class, and that therefore there is no longer any room for local legislation such as the ordinance here in question.

The Act of May 25, 1878, P. L. 144, forbade the sale of impure, adulterated or unwholesome milk throughout the state, and in sec. 3 directed the marking of wagons from which milk is sold in cities, etc. Then came the Act of July 7, 1885, P. L. 260, applicable to cities of the second and third classes (according to the classification of cities

into five classes by the Act of April 11, 1876, P. L. 20, and
hence to the city of Reading: see Com. v. Hough, 1 Pa.
Dist. Rep. 51, 52). It prohibits the sale, etc., of adul-
terated milk, or milk to which water or any foreign ma-
terial has been added or which is produced from cows sick
or diseased or fed on putrefying substances,—of skimmed
milk unless offered as such,—and of milk below a desig-
nated and extremely exacting, not to say impracticable
standard of richness, and enacts double and conflicting
provisions for the imposition of penalties for its violation,
which, as Judge ARNOLD in the case last cited, at p. 54,
says, are "confusing and make it difficult . . . . to give
the act a sensible application." It also invests inspectors
of milk (apparently officers appointed under the authority
given to municipalities by the act of 1869) with certain
powers and lays down rather extraordinary rules concern-
ing the procedure, evidence and costs in penal proceedings
for adulteration, etc., of which the title of the statute gives
no notice whatever. For this reason it would seem that
this enactment must be regarded as offending against
sec. 3, art. III, of the constitution. It may be also that, in
view of the decision in Ayars's App., 122 Pa. 266, it ought
to be held void under sec. 7 of the same article as pro-
hibited special legislation, because based upon an unlaw-
ful classification of cities and by reference to the same
applying to but part of what constitutes the third class
under the lawful classification made in the Act of May 23,
1874, P. L. 231, and not intended to reach the whole of
that class,—the act of 1885 being perhaps distinguishable
from the Act of May 13, 1887, P. L. 108, passed upon in
Com. v. Smoulter, 126 Pa. 137; Com. v. Miller, 126 Pa.
157; Liem's App., 9 Pa. Superior Ct. 569, in that the letter
meant to exact the licensing and to regulate the sale of
liquors in all cities and throughout the state. That in-
tention being manifest and express, the question there was
whether, the classes of cities below the third being dropped
and merged in the third, they were to be treated as be-
longing thereto for the purposes of the statute, and was

necessarily decided in the affirmative. Not the same question is presented where the statute, proceeding upon a certain classification of cities, restricts its operation to those which, under that classification, belong to the second and third classes, excluding altogether from its operation those below. Here the legislature can hardly be said to have intended that, upon a change of classification by. legislation or judicial ruling eliminating the classes below the third, the law should apply to all cities which, in consequence of such change, would then belong to the third class. So to administer the statute would be, not to apply it to cities it was intended to cover, giving effect to a mere modification of classification, but to extend it to cities it was distinctly not intended to affect at all,—in short, to remake the law. Next we have the general Act of June 26, 1895, P. L. 320, forbidding and punishing the adulteration of milk by the addition of so-called preservatives, and then that of June 10, 1897, P. L. 142 (whose first section was amended by the Act of April 19, 1901, P. L. 85), prohibiting the adulteration of milk by the addition of preservatives or coloring matter, and charging the agent of the department of agriculture (the dairy and food commissioner) with its enforcement,—and finally the Act of March 24, 1909, P. L. 62, forbidding throughout the state the sale, etc., of milk that has been watered or has had any part of the butter fat removed therefrom, except when offered or sold as skimmed milk,—providing a penalty for its violation,—making it the duty of the dairy and food commissioner to see to its enforcement,—directing the penalties collected by him to be paid into the state treasury,—repealing all inconsistent legislation,—but explicitly excepting and continuing in force the acts of 1897 and 1901,—thus, upon the principle expressio unius est exclusio alterius, indicating a purpose to abrogate the enactments of 1878 and 1885 and others. Besides the enactments above mentioned there are the Act of June 10, 1881, P. L. 116, against the sale, etc., of impure, etc., milk to butter or cheese factories, and the Acts of June 26, 1895,

P. L. 350, May 2, 1899, P. L. 164, and May 16, 1901, P. L. 221, relating to the sale, the licensing of vendors, etc., of milk in cities of the second class.

Looking at the legislation above detailed applicable in cities of the third class, it seems very clear that none of it presently in force can be regarded as designed or able to destroy the power given to the city of regulating the sale of milk within its limits by ordaining an inspection of its quality and sources. It will be observed that the statutes referred to, in so far as they are in force and applicable, have reference simply to the adulteration of milk by the addition of foreign substances or the impairment of its quality by the withdrawal of constituents naturally part of it. The matter of its wholesomeness or unwholesomeness depending upon the conditions, from a sanitary standpoint, under which the animals yielding it are kept, or upon the food on which they are fed, or upon their health, is not touched upon except (with respect to the last mentioned two particulars) in the act of 1885. As has been seen that statute is to be eliminated from the list. Even including it and the whole of the legislation detailed as in force, it is evident that its design is to lay down certain general rules and provide for their enforcement by the officers of the state. There is no necessary incongruity between such legislation and the delegation to municipalities of the power to supplement those rules and regulate the traffic in milk within their boundaries by ordinances of their own meeting their peculiar local needs and contravening no policy or mandate found in the general law. At all events there can be no conflict between the latter and the provision for municipal inspection and regulation in so far as these refer to matters not covered by the general law. That concession is enough to sustain the ordinance of February 4, 1909, in establishing a milk inspection by the city. That the power to establish such inspection necessarily implies the power of granting or withholding, on the basis thereof, a license to sell within the municipality, to forbid such selling without having

obtained a license therefor as the evidence of inspection made and passed, and to impose a penalty for selling without license, is too plain for discussion; for without the latter the grant of the former power would be practically nugatory: Warner v. Poor Directors, 38 Pa. Superior Ct. 437. On the other hand, the power to establish an inspection and exact the obtaining of a license to sell being admitted, the right to charge a reasonable sum for the same follows as involved in it. The question presented for decision in this case goes no further than that. It is not one of a sale of milk adulterated or defective under the provisions of the ordinance upon that subject. It is one of a person engaging in the sale of milk without having obtained a license to do so as required by the ordinance. It is that requirement (including of course the power of establishing an inspection of milk), with the right of the city to exact the appointed penalty for its violation, that is here in dispute. Upon that point, the only possible conclusion, under the law, would seem to be in favor of the city. In view of the nature of the inspection ordained, extending to an antecedent and continuing examination of the premises where the milk is kept for sale, the manner in which it is handled, the places where the cows producing it are kept, their treatment and food, and to an analysis from time to time of the milk itself (all of which involves the maintenance by the city, at considerable cost, of a force and laboratory adequate for these purposes) it cannot be said that the charge made for the license to sell is an unreasonable one. Nor is there any allegation to that effect made upon the record as a ground for invalidating the alderman's judgment.

It may be noted in this connection that there is no similarity between this case and that of Reading v. Bitting, 167 Pa. 21. There the city, under its power to collect a license tax upon drays, hacks, carriages, omnibuses, carts, wagons, etc., used in the city for hire or pay, Act of May 23, 1889, P. L. 277, art. V, sec. 3, cl. IV, undertook to collect the sum of $5.00 from milkmen for every

wagon used by them for the delivery of milk to customers. This was held unwarranted by the clause referred to. The distinction between the character of that exaction as a mere tax and that involved in this case is indicated in the statement of the decision that the former "does not profess to be an exercise of the police power for the regulation of the trade in milk." The latter does profess to be and emphatically is just that, and hence its lawfulness depends on wholly different principles and powers.

3. If what has been said in the discussion of the preceding objection is correct the contention that the milk and meat inspector has no authority under the provisions of the ordinance of February 4, 1909, relative to milk falls with it.

4. There is in the ordinance in question no attempt either to delegate to the board of health of the city of Reading the enforcement thereof, or to direct the same to make rules and regulations under it. Whatever authority the board of health may have concerning the matter of the sale of milk within the city under sec. 5 of the act of 1873, it is adequately recognized in the ordinance enjoining the observance of its rules and regulations upon the milk and meat inspector. If that section was intended or can be deemed effective to confer upon the board such powers as the city by the ordinance is assuming to exercise, that circumstance can certainly not be regarded as destroying the right of the city under the acts of 1869 and 1889 to legislate upon a subject manifestly within the purview of those statutes, concerning which the board does not appear to have exercised the powers given to it.

It follows from what has been said that the exceptions filed afford no ground for reversing the judgment of the alderman, and therefore the writ of certiorari is dismissed and the proceedings are affirmed.

*Error assigned* was the judgment of the court.

*W. B. Bechtel*, for appellant.

*Henry P. Keiser*, city solicitor, for appellee.

PER CURIAM, December 12, 1910:

Even if it be conceded that the Act of July 7, 1885, P. L. 260, is not wholly unconstitutional, the learned president judge of the common pleas has clearly and satisfactorily shown that the ordinance of February 4, 1909, so far as its provisions are involved in the present case, can be sustained. We, therefore, may withhold an expression of decided opinion upon the constitutionality of that act. With this suggestion nothing further need be added to the opinion of the learned judge in support of the judgment.

The judgment is affirmed.